GAIDRY, J.
|2The plaintiff homeowners, husband and wife, appeal a summary judgment dismissing their claims against their homeowners insurer for property damage and personal injury alleged to have resulted from hidden redhibitory defects at the time they purchased their home. For the following reasons, we reverse the judgment.
FACTS AND PROCEDURAL HISTORY
The plaintiffs, Lawrence P. Mangerchine and Kim C. Mangerchine, purchased immovable property, including a house, from Robert F. Reaves and Dawn Oglesby Reaves on July 26, 1996. The defendant, Travelers Indemnity of Connecticut (Travelers), subsequently issued a policy of homeowners insurance to the plaintiffs on July 26, 1997, providing property damage coverage from that date through July 26, 1998.
On March 30, 1999, the plaintiffs instituted this action for damages against the sellers, the involved real estate agencies, and Travelers, alleging that the house had redhibitory defects, that the sellers and the real estate agencies knew or should have known of such defects and failed to disclose them to the plaintiffs, and that they sustained property damages and per *1052 sonal injury caused by the defective conditions.[1] In their verified petition, the plaintiffs characterized the defects as susceptibility to flooding and a black mold infestation causing structural damage to the joists beneath the house. The plaintiffs also sought rescission of the sale.
Travelers filed its answer on July 6, 1999, denying any liability under its policy. It further specifically alleged that coverage was excluded for the plaintiffs’ claims of redhibition, personal injury and other damages, that [¡¡there was no “occurrence” under the policy, and that the plaintiffs were not insured for them alleged losses.
On April 18, 2000, Travelers filed a motion for summary judgment, seeking its dismissal on the grounds that its policy did not provide coverage for any of the plaintiffs’ claims. The motion was fixed for hearing on June 26, 2000.
On June 26, 2000, the plaintiffs filed an amended petition, verified by Ms. Manger-chine’s affidavit, adding the allegation that the house’s defective condition and hidden decay caused the collapse of the floor joists and the floor itself. On the same day, the trial court heard the motion for summary judgment, and following the hearing took the matter under advisement for determination.
On July 11, 2000, the trial court issued its written reasons for judgment, ruling that the motion for summary judgment would be denied. Its judgment denying the motion was signed on July 27, 2000.
On July 10, 2009, Travelers filed a second motion for summary judgment, seeking the dismissal of the plaintiffs’ claims against it on the grounds that the plaintiffs lacked standing to continue to assert their claims, as they filed for bankruptcy in 2002 and no longer owned the immovable property at issue, and that the damages preexisted the issuance of its policy.[2]
Travelers’s second motion for summary judgment was heard on September 16, 2009, and the trial court granted the motion. Its judgment granting the motion (but not dismissing Travelers as a defendant) was signed on September 25, 2009. The plaintiffs filed a motion for new trial, and, after a hearing, that motion was denied by judgment signed on January 6, 2010.
|4The plaintiffs then instituted this devol-utive appeal. On September 27, 2010, this court issued an interim order remanding this matter to the trial court for the purpose of signing a valid judgment on the motion for summary judgment, as the trial court’s original judgment of September 25, 2009 lacked the appropriate decretal language dismissing the plaintiffs’ claims against Travelers. On October 6, 2010, the trial court signed a revised judgment dismissing the plaintiffs’ claims against Travelers.[3]
ASSIGNMENTS OF ERROR
We summarize the plaintiffs’ assignments of error on the part of the trial court as follows:
(1) The trial court committed legal error in applying the “occurrence” (injury-in-fact) trigger theory of coverage rather *1053 than the “manifestation” trigger theory of coverage.
(2) The trial court erred in holding that a claim in redhibition against the seller of defective property and a claim under a homeowners’ policy for property damage manifested during the policy period are mutually exclusive.
(3) The trial court erred in failing to find that the petition set forth factual allegations that the plaintiffs did not discover the property damage until April 1998, when they first notified Travelers.
(4) The trial court erred by not permitting the plaintiffs to amend their petition to cure any ambiguity in its allegations.
DISCUSSION

Standard of Review: Summary Judgment

Summary judgment is subject to de novo review on appeal, using the same standards applicable to the trial court’s determination of the issues. Berard v. L-3 Communications Vertex Aerospace, LLC, 09-1202, p. 5 (La.App. 1st Cir.2/12/10), 35 So.3d 334, 339-40, unit denied, 10-0715 (La.6/4/10), 38 So.3d 302. We are authorized and, indeed, required to render a judgment that is “just, legal, and proper upon the record on appeal.” La. C.C.P. art. 2164; Jackson Nat'l Life Ins. Co. v. Kennedy-Fagan, 03-0054, p. 5 (La.App. 1st Cir.2/6/04), 873 So.2d 44, 48, unit denied, 04-0600 (La.4/23/04), 870 So.2d 307.
The summary judgment procedure is expressly favored in the law, and is designed to secure the just, speedy, and inexpensive determination of non-domestic civil actions. La. C.C.P. art. 966(A)(2). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits in the record show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
Interpretation of an insurance policy is usually a legal question that can be properly resolved by summary judgment. Doe v. Breedlove, 04-0006, p. 7 (La.App. 1st Cir.2/11/05), 906 So.2d 565, 570. However, summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded. Gaylord Chem. Corp. v. Pro-Pump, Inc., 98-2367, pp. 3-4 (La.App. 1st Cir.2/18/00), 753 So.2d 349, 352.

General Principles of Insurance Policy Interpretation

Whether a contract is ambiguous or not is a question of law. Bonvillain Builders, LLC v. Gentile, 08-1994, p. 5 (La.App. 1st Cir.10/30/09), 29 So.3d 625, 629, unit denied, 10-0059 (La.3/26/10), 29 So.3d 1264. The starting point in the analysis of an insurance policy is the principle that an insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. LeBlanc v. Aysenne, 05-0297, p. 3 (La.1/19/06), 921 So.2d 85, 89.
The words of a contract must be given their generally prevailing meaning. La. C.C. art. 2047. Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art. 2048. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La. C.C. art. 2049. Each provision in a con *1054 tract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.
Ambiguity of a term or clause in an insurance policy will also be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered. Halphen v. Borja, 06-1465, p. 4 (La.App. 1st Cir.5/4/07), 961 So.2d 1201, 1205, writ denied, 07-1198 (La.9/21/07), 964 So.2d 338. Even so, an insurance pohcy should not be interpreted in an unreasonable or strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Magnon v. Collins, 98-2822, p. 7 (La.7/7/99), 739 So.2d 191, 196.
A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party. La. C.C. art. 2056. In the specific context of insurance, the rule is that if, after applying the other general rules of construction, an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer who issued the | ypolicy and in favor of coverage for the insured. La. Ins. Guar. Ass’n v. Interstate Fire & Cas. Co., 93-0911 (La.1/14/94), 630 So.2d 759, 764. For a genuine ambiguity to exist and for this rule of strict construction to apply, an insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable. Bonin v. Westport Ins. Corp., 05-0886, p. 6 (La.5/17/06), 930 So.2d 906, 911.

When Was Coverage Triggered Under the Travelers Policy?

In its oral reasons for judgment denying the plaintiffs’ motion for new trial on the summary judgment in favor of Travelers, the trial court explained the basis of its original ruling on the motion for summary judgment:
I feel like the original decision was in agreement with the current state of the law. I feel that the plaintiff [sic] has the burden in this matter of establishing when the triggering event took place and that it took place during Travelers[s] policy period. It’s my opinion that the plaintiff [sic ] in this matter has pled that the defect that has created this problem preexisted their ownership of this house and has filed a redhibition claim. I do not feel that it’s appropriate that a redhibition action would also go forward with a claim against the homeowners insurance. That’s the basis of the Court’s ruling.
The “trigger” of coverage is the event or condition that determines whether (and when) a policy responds to a specific claim. Cole v. Celotex Corp., 599 So.2d 1058, 1075 n. 50 (La.1992). It describes what must happen, according to the terms of an insurance policy, for the potential of coverage to arise. David T. Grand, Jr., Comment, Nailing Down Occurrence Triggers for Property Damage in the Wake of Redevelopment — Why a Distinction Should Be Made Between First and Third Party Policies, 68 La. L.Rev. 605, 606 n. 9 (2008), citing Montrose Chem. Corp. of Cal. v. Admiral Ins. Co., 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 880 n. 2 (1995).
| sCourts nationwide have developed and applied a number of different trigger theories, applicable to various factual situations and coverage types, to address the complicated issue of coverage of continuous and progressive property damage with delayed onset or manifestation. Chandra Lantz, Note, Triggering Coverage of Progressive Property Loss: Preserving the Distinc *1055 tions Between First-and Third-Party Insurance Policies, 35 Wm. & Mary L.Rev. 1801, 1801-03 (1994). The most common of these recognized in Louisiana are:
(1) The exposure theory: Coverage is triggered when the property is exposed to the harmful conditions during the policy period;
(2) The manifestation theory: Coverage is triggered when the damage manifests itself and is discovered or should have been discovered during the policy period;
(3) The injury-in-fact theory: Coverage is triggered when damage actually occurs in the policy period, regardless of when the damage has become manifest; and
(4) The continuous or triple trigger theory: Coverage is triggered at the time of initial exposure to the harmful condition, all times of continuing exposure, and the time of manifestation of the damage.
See Cole, 599 So.2d at 1075-76, and Grand, supra, at 609-10. See also Lantz, supra, at 1804-05; and 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 102:22 (3rd ed.2010).
The determination of when coverage for a loss is triggered by an event should not be made without initial analysis of the policy language, as the policy expresses the parties’ mutual intent and its language determines the | imperative conditions upon which the insurer’s obligation to indemnify the insured is based. See Lantz, supra, at 1808-09. The application of the appropriate theory of the trigger of coverage also depends upon the specific policy language of the particular policy at issue, as the various trigger theories developed by the courts are themselves direct outgrowths of the interpretation of relevant terms used in policies, such as “occurrence.” See Lantz, supra, at 1803. Accordingly, we must first examine the relevant language of the Travelers policy.
The policy period stated in the declarations page is July 26, 1997, to July 26, 1998. Section I of the policy, entitled “Property Coverages,” contains the policy terms and provisions governing first-party coverage for property damage in favor of the insureds.[4] Coverage A under Section I provides coverage for the insureds’ residence on the insured premises, including any attached structures. Under its general “Conditions” section, the policy provides that it applies “only to loss in Section I [“Your Property”] ... which occurs during the policy period shown in the Declarations.” (Emphasis added.) Notably, the losses that are covered are not described in terms of “property damage” caused by an “occurrence,” terms defined in the policy and used in Section II, ‘Your Liability,” but rather in terms of “direct physical loss” caused by certain “perils insured against.”[5]
1 ^Section I provides a number of “Additional Coverages,” including Additional Coverage 11, entitled “Collapse.” This provision provides that Travelers covers the insureds “for direct physical loss to *1056 covered property involving collapse of a building or any part of a building” caused by certain enumerated perils, including “hidden decay” and “hidden insect or vermin damage.” (Emphasis added.)
The policy provides that certain types of “loss” to the insured residence are excluded from coverage under Section I, such as loss involving “collapse, other than as provided in Additional Coverage 11,” as well as loss caused by “wear and tear, marring, deterioration;” “inherent vice, latent defect, mechanical breakdown;” “smog, rust, mold, wet or dry rot; ” and “settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings.” (Emphasis added.) Other “General Exclusions” include “water damage,” including damage caused by “flood” or “water below the surface of the ground.” The applicability of the foregoing exclusions to the plaintiffs’ claims was not placed at issue by Travelers in its second motion for summary judgment. The sole coverage issue addressed by both the motion and the trial court’s judgment was whether the plaintiffs’ claimed loss occurred prior to the issuance of the Travelers policy. Accordingly, we need not address the merits of any applicable exclusions at this time.[6]
“Loss” and “direct physical loss” are not defined in the policy; accordingly, those terms must be given their ordinary, generally-accepted meanings. See La. C.C. art. 2047. In general, a “loss” means a | ^“destruction,” “ruin,” or “deprivation.” Merriam-Webster’s Collegiate Dictionary 736 (11th ed.2008). Another definition of “loss,” in the specific context of insurance, is “the amount of an insured’s financial detriment by ... damage that the insurer is liable for.” Id.[7] The determination of when “damage” to property occurs, strictly speaking, involves only an objective analysis of the time at which actual physical change or injury to the property takes place. The term “loss,” on the other hand, combines the element of physical damage to the property with that of corresponding reduction in patrimony from the subjective standpoint of the insured.
The terms “loss” and “damage,” as used in insurance policies, are not necessarily synonymous. See Corban v. United Services Auto. Ass’n, 20 So.3d 601, 612 (Miss.2009). A “loss” under the property coverage of a homeowners’ policy is incurred by an insured and typically, but not always, follows “damage” to the insured property. Id. Physical damage is only one cause of “physical loss” of property; for example, a person can suffer the physical loss of property through theft, without any actual physical damage to the property. Id. at 612 n. 17.
The Travelers policy provides that the insureds have certain duties in the event of a “loss to covered property.” The insureds are required to “give prompt notice to [Travelers].” Additionally, within 60 days after request by Travelers, the insureds must send a “signed, sworn proof of loss which sets forth, to the best of [them] knowledge and beliefl,] ... the time and *1057 cause of loss.” In the event that the insureds decide to sue Travelers for a loss covered under the policy, the policy states that “[l]egal action taken against [Travelers] must begin within two years after the date of loss.”
l12In order to report a “loss” under their policy, the insureds must obviously be aware of that loss. The phrases “time of loss” and “date of loss” are not expressly defined in the Travelers policy. However, the insureds’ duty to provide the “time of loss” in them proof of loss is framed in terms of the insureds’ subjective “knowledge and belief” as to that time. As one commentator explains:
Unlike third-party insurance, first-party insurance policies contain notice and suit limitation provisions that are quite specific....
The policy language also requires that there be some degree of “knowledge and belief’ on behalf of the insured as to the time and origin of the loss when submitting a claim for indemnification. As a result, to bring a claim under a first-party policy the insured must have knowledge of the loss and a reasonable belief as to the time and origin of the loss. In addition, the insured must be prepared to bring suit on any coverage disputes regarding that loss within [the time period stated in the policy]. These provisions and their corresponding limitations and public policy ramifications have encouraged many courts to apply the manifestation trigger as the trigger that best harmonizes the policy intentions. By doing so, the preclusive effect of an untimely claim by the insured is minimized. [Footnotes omitted.]
Lantz, supra, at 1810-11.
To be covered under the Travelers policy, the insureds’ property loss must “occur” during the policy period. Significantly, the word “occur” is synonymous not only with “happen” (in the sense of “to come into existence”) but also in another sense with “appear.” Merriam-Webster’s Collegiate Dictionary 858 (11th ed.2008). “Appear” is defined as “to become evident or manifest.” Id. at 60. “Manifest,” used as an adjective as above, is synonymous with “obvious” and “evident.” Id. at 755. As a verb, it is defined as “to make evident or certain by showing or displaying,” and is synonymous with “show.” Id. at 756.
|13We conclude that the interpretation of the term “occurs,” used in Coverage A, Section I of the Travelers policy, as meaning “appears” or “becomes evident” is just as reasonable, if not more so, as an interpretation of “occurs” to mean “happens” or “comes in existence.” Thus, the term is ambiguous as a matter of law, and the former interpretation, more favorable to the insured, should apply here.
Commentators have recommended that the choice of a particular trigger theory should take into account whether first-party insurance coverage or third-party insurance coverage is involved. See Grand, supra, at 608, and Lantz, supra, at 1808. We agree that that circumstance is relevant, in that it bears upon the mutual intent of the parties and the specific purpose of the particular coverage. As has been aptly observed, “a difference in risk results in different policy language and different expectations of the contracting parties, and demands a different analysis to determine whether coverage has been triggered.” Grand, supra, at 628. In the case of first-party property coverage, the cited commentator makes the following observations and recommendations:
When a homeowner initiates a claim against his homeowner’s insurance carrier, coverage should be triggered when the homeowner discovered or reasonably should have discovered the damage. *1058 Application of the manifestation theory-in this context complies with the policy language of the standard homeowner’s policy and conforms with the expectation a typical homeowner has in looking to the insurer to whom he is paying premiums to cover such damage.
If, however, the homeowner believes such damage is caused by a construction defect resulting from a contractor’s negligence, then the homeowner could bring an action directly against the contractor. In such a case, the contractor’s CGL carrier would be looked to for coverage by the contractor in the event liability was imposed upon him. On the other hand, the homeowner’s first[-]party policy could pay the insured homeowner and thereafter be subrogated to the homeowner’s right to file a negligence claim against the contractor. In either case, because the CGL policy should provide coverage against |14the contractor’s liability, an injury-in-fact analysis should be applied to determine when damage actually occurred, thus triggering coverage. In addition, if the evidence is such that the damage actually occurred and continued to occur, as in the case of water or mold damage, then the continuous injury trigger should be utilized to allocate liability among all third[-]party liability insurers who provided coverage during this period. [Footnotes omitted.]
Id. at 628-29.
A review of Louisiana jurisprudence involving third-party claims for construction defects under commercial general liability (CGL) policies shows that the manifestation theory is the most generally-accepted trigger theory for such claims. See, e.g., Korossy v. Sunrise Homes, Inc., 94-473 through 94-502, p. 17 (La.App. 5th Cir.3/15/95), 653 So.2d 1215, 1226, writs denied, 95-1522 (La.9/29/95), 660 So.2d 878, 95-1536 (La.9/29/95), 660 So.2d 878; St. Paul Fire & Marine Ins. Co. v. Valentine, 95-0649, p. 5 (La.App. 1st Cir.11/9/95), 665 So.2d 43, 46, writ denied, 95-2961 (La.2/9/96), 667 So.2d 534; Oxner v. Montgomery, 34,727, 34,766, pp. 9-12 (La.App. 2nd Cir.8/1/01), 794 So.2d 86, 92-94, writ denied, 01-2489 (La.12/7/01), 803 So.2d 36; and cases cited therein. But the issue is far from settled in Louisiana, and there is considerable inconsistency in the jurisprudence involving damage claims arising from construction defects under CGL policies. In short, the manifestation theory has not been uniformly adopted in such cases as a bright line rule. See, e.g., Orleans Parish School Bd. v. Scheyd, Inc., 95-2653, pp. 5-7 (La.App. 4th Cir.4/24/96), 673 So.2d 274, 277-78.[8]
The plaintiffs cite the Oxner case and other cases involving CGL policies as persuasive authority for application of the manifestation theory in 11Bthis case. While we agree that some of the factual circumstances and considerations addressed in those cases are relevant to determination of this case, we do not find their adoption of the manifestation theory conclusive, for the simple reason that first-party property coverage, with different policy language, is involved here. Those cases are therefore distinguishable on their facts from the present case.
Commentators have emphasized that the manifestation theory may be inappropriate in cases involving third-party liability cov *1059 erage and that the injury-in-fact theory is most consistent with the language of liability policies, which generally distinguish between the “accident” or “occurrence” (the causative event) and resulting property damage. See Grand, supra, at 621-26, and Lantz, supra, at 1830-34. If the manifestation theory has been found to be appropriate in Louisiana cases involving third-party liability coverage, then it should seemingly be even more appropriate in first-party property insurance cases, for the reasons discussed herein. In its brief, Travelers seems to implicitly concede that the manifestation theory applies, by urging that the plaintiffs’ own petition confirms that “the alleged damages had already manifested at the time of the sale of the property, July of 1996.” (Emphasis added.)
Travelers cites the case of Davidson v. United Fire & Cas. Co., 576 So.2d 586 (La.App. 4th Cir.1991), in support of the proposition that the plaintiffs bore the burden of proving when the “damage” to their residence actually occurred. Davidson involved first-party property coverage under a homeowner’s policy, as in the present case. The relevant policy language was essentially the same as that of the Travelers policy in this case. The insureds in Davidson sued their homeowners’ insurer for termite damage following their discovery of a termite infestation. Although the insured did hanot discover the termite infestation itself until 12 days after the issuance of the policy, they had observed ceramic tiles falling from a wall in a bathroom one to two months prior to the discovery of the infestation, later shown to have been caused by termite damage inside the wall. The insureds argued that because the termite damage or “collapse” was hidden until their discovery of the infestation, the actual time it occurred was not susceptible of proof, and the exposure theory or continuous trigger theory should be applied to find coverage. Id at 589.
The court in Davidson disagreed with the cases cited by the insureds in support of their position, pointing out that those cases involved third-party claims under liability coverage and relied upon the specific policy definition of “occurrence” to determine when that liability coverage was triggered. Id. at 590. The court noted that the covered peril at issue was not an “occurrence” as defined in the liability portion of the homeowners’ policy, but rather a “collapse,” and that the terms “occurrence” and “collapse” were not synonymous. Id. The court held that under the first-party property coverage the “collapse” was the event that triggered coverage, rather than exposure. For purposes of its analysis, the court assumed that the extensive termite damage constituted a “collapse” under the policy and held that the insureds had the burden of proving that the collapse occurred during the policy period. Id. The court held that the evidence showed that the extensive damage could not have taken place within the 12-day period between issuance of the policy and the insureds’ discovery of the termite infestation, and affirmed the trial court’s judgment in favor of the insurer. Id. at 590-91.
Without expressly saying so, Travelers seems to suggest that the decision in Davidson supports the application of the injury-in-fact theory |17rather than the manifestation theory to determine the trigger of coverage. We disagree. The court in Davidson did not identify the particular trigger theory employed, other than to state that coverage was triggered by the “collapse,” which it equated with the extensive termite damage. While that damage was hidden until some point in time, the court emphasized that “[t]he falling tiles occurred prior to discovery of the *1060 termites.” Id. at 591. Thus, the falling of the tiles constituted a manifestation of the hidden damage that occurred prior to issuance of the policy, and the ultimate result in Davidson is fully compatible with application of the manifestation theory. To the extent that Davidson may stand for application of the injury-in-fact theory, we disagree with its rationale.
Taking into account all of the foregoing considerations, we conclude that the manifestation theory is applicable under the specific policy language and the type of coverage involved here. The manifestation theory best accords not only with one reasonable and generally-accepted meaning of the term “occurs,” as that verb is used in this policy, but also with a reasonable interpretation of the policy that supports a finding of coverage, rather than one precluding coverage. The phrase “time of loss,” as used in the policy’s reporting obligation on the part of the insureds, should obviously relate to the time of the insureds’ discovery of their loss.
Additionally, the policy’s coverage for “collapse” caused by “hidden decay” under Additional Coverage 11 is entirely consistent with the manifestation theory, the “collapse” being an external manifestation of the decay. The application of the manifestation theory also eliminates the difficult factual and evidentiary issue of determining when hidden property damage actually occurs in a strict physical sense. James Pest Control, Inc. v. Scottsdale Ins. Co., 99-1316, p. 12 (La.App. 5th Cir.6/27/00), 765 So.2d 485, 491, writ denied, 00-2285 (La.10/27/00), 772 So.2d 657. See also Grand, supra, at 625. This serves the interests of both the insured and the insurer by promoting certainty as to the insured status of a loss.[9] In the case of first-party property coverage such as that involved here, it also promotes the public policy disfavoring prescription and underpinning the doctrine of contra non valentem by delaying the commencement of the prescriptive period available to insureds damaged by hidden, insidious perils. See Lantz, supra, at 1814 and 1834.
In so holding, we emphasize that we are neither pronouncing a general or bright-line rule nor advocating the general application of the manifestation trigger theory to all homeowners’ policies or first-party property damage coverages. Careful analysis of the policy language, considered in light of the type of coverage, the parties’ reasonable expectations, and public policy, must remain the basis for determining the proper trigger theory applicable in any particular case.
The plaintiffs’ first assignment of error has merit with regard to the appropriate trigger theory applicable here as a matter of law. However, this alone does not resolve the issue of the correctness of summary judgment in this case. It is not clear from the trial court’s reasons for judgment that it in fact rejected the manifestation theory, and proper application of the theory depends upon the content of the pleadings, affidavits, and other evidence in the record.

Is the Date of Loss Undisputed?

Having determined that the manifestation theory applies to the policy coverage at issue, we must next determine whether there is genuine issue of 119material fact as to whether the trigger of coverage fell within the policy period. That is, we must determine whether there is genuine issue of material fact as to whether the damages “occurred,” or first *1061 became manifest or evident, between July 26,1997 and July 26,1998.
Louisiana Code of Civil Procedure article 891 requires that the petition include a “short, clear, and concise statement of all causes of action” and “the material facts of ... the transaction or occurrence that is the subject matter of the litigation.” A fact is “material” when its existence or nonexistence may be essential to the plaintiffs cause of action under the applicable theory of recovery. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751. Louisiana Code of Civil Procedure article 860 explains that “[f]or the purpose of testing the sufficiency of a pleading, allegations of time and place are material and shall be considered as all other allegations of material matter.”
In their original petition, the plaintiffs alleged that “[a]t the time of the sale, the house was defective,” in that it was “infested with black mold beneath the house” and “subject to flooding,” and that they “would not have purchased the property had the defect been lenovm.” (Emphasis added.) They alleged that the sellers knew of the alleged “defects” and that the “black mold problem [was] causing structural damage to the joists under the house,” but “failed to disclose the defect[s]” to the plaintiffs. (Emphasis added.) Alternatively, the plaintiffs alleged that “the defect was of such a nature as it could not have been discovered by reasonable inspection.” (Emphasis added.) They further alleged that the real estate agencies also failed to disclose the defects to them. The plaintiffs failed to allege when the defects or damages became known to them, but alleged only that at somej^unstated time Travelers was notified of “the defective condition” and their “continuing injury.”
In an affidavit filed on June 26, 2000, in opposition to Travelers’ first motion for summary judgment, Ms. Mangerchine stated that “subsequent to [the] purchase of the property ..., the floor joists supporting a portion of the building with an area of about 800 square feet collapsed over time.” (Emphasis added.) Ms. Man-gerchine also attested that her family vacated the premises “due to the condition of the collapse of the floor joists” and “due to the health risk of habitation of the home and exposure to black mold discovered.” (Emphasis added.) The affidavit, like the original petition, however, is deficient in failing to state the date or time period of the described collapse or the discovery of the defects or damage. The plaintiffs’ amended petition, also filed on June 26, 2000, added the allegation that “[t]he defective condition and hidden decay resulted in the collapse of the floor joists and ultimately the floor itself in an area of about 800 square feet of the building rendering it unusable and unsafe for habitation.” (Emphasis added.) Again, no date for the collapse or any other manifestation was stated.
The plaintiffs’ petition, as amended, does not specify the date or time period when the damages caused by the defective conditions were discovered or become evident to them. Such an omission, while material, is not necessarily fatal for purposes of summary judgment, although it could certainly have provided the basis for a dilatory exception of vagueness or ambiguity or even a peremptory exception of no cause of action. In some cases, the failure to allege specific dates, rather than broad time periods, does not preclude finding genuine factual dispute as to the existence of insurance coverage. See, e.g., Fed. Ins. Co. v. St. Paul Fire & Marine Ins. Co., 93-1099, p. 7 (La.App. 1st Cir.6/24/94), 638 So.2d 1132, 1135. However, this is not a carte blanche rule excusing the omission of material dates without consideration of the *1062 particular factual allegations and evidence in each case.
While the plaintiffs’ petition clearly alleges that the described redhibitory defects and the black mold infestation existed at the time of the sale, it does not allege that the defects and resulting damages were manifest or evident to them at that time; in fact, it clearly states the exact opposite. Travelers seems to suggest that the plaintiffs’ allegation that redhibitory defects existed at or prior to the time of the sale must be equated with a binding allegation that such defects and any related damages manifested themselves at the same time. To the contrary, a condition may exist, yet be hidden, unseen, or unnoticeable until it evolves to the point where it is manifest. By definition, a defect that is known or should have been discovered by the buyer cannot be a redhibitory defect. La. C.C. art. 2521. A defect is redhibitory when it is hidden, that is, not apparent, nor known to the buyer. La. C.C. art. 2521, Revision Comments, (b). Thus, the joinder of a redhibition claim for pre-exist-ing defects unknown at the time of sale with a claim under first-party property coverage allegedly in effect at the time of manifestation of resulting damage is not legally inconsistent. We agree with the plaintiffs that the trial court committed legal error in so concluding.
Reading the petition as a whole in light of the requirements of La. C.C.P. art. 860, the only reasonable conclusion which may thus be drawn from its allegations is that the damages resulting from the defective conditions manifested themselves sometime following the date of the sale. This conclusion is corroborated by Ms. Manger-chine’s affidavit. Whether that manifestation or the discovery of the damages by the plaintiffs occurred leafier the effective date of the Travelers policy and during the policy period is a genuine issue of material fact. The trial court erred in granting summary judgment on this issue. Because of this holding, it is unnecessary for us to address plaintiffs’ last two assignments of error.
The judgment of the trial court is reversed. All costs of this appeal are assessed to the defendant-appellee, Travelers Indemnity of Connecticut.
REVERSED.
CARTER, C.J., concurs.
WELCH, J., concurs without reasons.

. The defendant real estate agencies were later dismissed by summary judgments.

. The issue of the plaintiffs' standing or their right of action was apparently never ruled upon by the trial court and not raised as an issue on appeal.

.Although the revised judgment was designated or certified by the trial court as a partial final judgment for purposes of appeal, such action was technically unnecessary, as the summary judgment dismissing Travelers as a party defendant constituted a final, ap-pealable judgment by definition. La. C.C.P. arts. 1911, 1915(A)(1), (3).

. Property insurance is considered "first-party” insurance, in the sense that it covers a loss sustained by the insured, the first party to the insurance contract, as opposed to liability or "third-party” insurance, which covers the insured’s liability to a third party (a non-party to the insurance contract) for that party’s loss. See Black’s Law Dictionary 817, 1518 (8th ed.2004).

. "Property damage" is defined in the policy as "physical injury to, destruction of, or loss of use of tangible property.” "Occurrence” is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in ... ‘bodily injury’; or ... ‘property damage’.”

. Even if the alleged redhibitory defects caused or included "wet rot” or "mold” that in turn caused further property damage, such damage may not necessarily be excluded from coverage if die causative conditions might otherwise be held to constitute "hidden decay” causing a "collapse” of part of the house. See Wilson v. Aetna Cas. & Sur. Co., 619 So.2d 1213, 1215-16 (La.App. 3rd Cir.1993).

. See also Black's Law Dictionary 963 (8th ed.2004), where "loss” for insurance purposes is defined as "[t]he amount of financial detriment caused by ... an insured property's damage, for which the insurer becomes liable.”

. In Rondo v. Top Notch Properties, L.L.C., 03-1800, p. 18 (La.App. 4th Cir.6/2/04), 879 So.2d 821, 833, the court extensively surveyed the jurisprudence relating to the issue of the trigger of coverage in CGL policies for construction defects, noting that "the clear weight of authority in more recent cases” supported use of the manifestation dieory. In doing so, however, it observed that "a clear signal from the Supreme Court on this issue would surely do much to eliminate expensive future litigation.” Id.

. Thus, the last-cited commentator concludes that "[t]he adoption of the manifestation theory in the first[-]party context makes practical sense from both the standpoint of the insured as well as the insurer.” Grand, supra, at 621.